UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUDBURY PUBLIC SCHOOLS                )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )
                                      )   CIVIL ACTION NO.
MASSACHUSETTS DEPARTMENT OF           )   10-10988-DPW
ELEMENTARY AND SECONDARY EDUCATION,   )
BUREAU OF SPECIAL EDUCATION APPEALS,  )
and STUDENT, by and through his mother)
SUSAN DOE,                            )
                                      )
        Defendants,                   )
                                      )

MEMORANDUM AND ORDER
December 23, 2010

Plaintiff Sudbury Public Schools ("Sudbury") seeks judicial review of a decision of the Massachusetts Bureau of Special Education Appeals ("BSEA"), made pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, in which the Hearing Officer ordered Sudbury to reimburse Student for private educational placement during the 2009-2010 school year. The Hearing Officer based this order on a finding that Sudbury had violated its obligation to offer Student free and appropriate education ("FAPE"). Sudbury and the Defendants, the BSEA and Student, by and through his mother, Susan Doe ("Parent"), have submitted cross-motions for summary judgment.

# I. BACKGROUND

## A. *Statutory Framework*

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). As a condition for receiving federal funding under the IDEA, states must comply with all of its requirements, including the provision of FAPE to all disabled children. *Id.* § 1412(a). Massachusetts implements and supplements the federal requirements found in the IDEA through state law and regulation. *See* MASS. GEN. LAWS ch. 71B; 903 MASS. CODE REGS. 28.01 *et seq.*

To effectuate the delivery of FAPE, the IDEA requires a state or local educational agency to conduct an initial evaluation and develop an Individualized Education Program ("IEP") prior to the provision of special education services. 20 U.S.C. §§ 1414(a), (d); *see Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) ("The primary vehicle for delivery of a FAPE is the child's IEP."). The IEP is a written statement which sets out the child's current academic achievement and functional performance, measurable annual goals, a description of how progress is to be measured, the services and individual accommodations to be provided by the school, and the

extent of the child's participation in classes with nondisabled
children. 20 U.S.C. § 1414(d)(1)(A)(i). The IEP is developed by
an "IEP Team," which includes the parents, a regular and special
education teacher, a representative of the educational agency, an
individual who can interpret evaluation results, and other
individuals who have "knowledge or special expertise regarding
the child." *Id.* § 1414(d)(1)(B). A student or parent may
challenge the adequacy of an IEP by submitting a complaint and
requesting a hearing before a state or local educational agency.
*Id.* §§ 1415(b)(6), 1415(f).

Both federal and state regulations govern the procedures
applicable to hearings before the educational agency, which in
Massachusetts is the BSEA. *See id.* § 1415; 34 C.F.R. §§ 300.507-
300.508; MASS. GEN. LAWS ch. 71B, § 2A; 603 MASS. CODE REGS. 28.08.
Decisions of hearing officers are final and reviewable in the
federal district court. 20 U.S.C. §§ 1415(i)(1)(A),
1415(i)(2)(A).

**B.  *Factual Background***

In 2005, Student, who is now thirteen years old, was first
found, by the Dennis-Yarmouth Regional School District, to have
special education needs requiring an IEP. *See* Individualized
Education Program, Oct. 4, 2005 – Oct. 4, 2006, A.R. 1204-05. At
that time, Student was found to have a "language-based learning
disability" that was "interfering with his ability to make

3

effective progress in school." *Id.* at 1204. Student was in second grade at that time and was enrolled in a private school. *Id.* He never received special education services from the Dennis-Yarmouth school district before moving with Parent to Sudbury, Massachusetts in 2006. *Id.*; Testimony of Parent, A.R. 2111-14. In her testimony, Parent affirmed that the family moved to Sudbury with the intention of enrolling Student at The Carroll School, Testimony of Parent, A.R. 2109-10, a private school specifically designed to serve students with language-based disabilities. Testimony of Theresa Gregory, Director of Education, The Carroll School, A.R. 1804-06.

In the fall of 2006, after Student was enrolled for third grade in The Carroll School, Parent sought a reevaluation from Sudbury. Narrative Description of School District Proposal, Nov. 6, 2006, A.R. 1140-1142; Testimony of Parent, A.R. 2109; Testimony of Luan Dean, Out-of-District Coordinator, Sudbury Public Schools, A.R. 2276-77. In late 2006 and early 2007, Sudbury conducted a number of assessments and evaluations, including an occupational therapy evaluation, A.R. 1135-38, a speech/language evaluation, A.R. 1132-34, an educational assessment, A.R. 1128-31, a home assessment, A.R. 1123-27, and an interview by a school psychologist, A.R. 1111-13. In addition, Parent privately procured an audiological evaluation from Ms. Gerri Shubow, A.R. 1114-22. Parent also provided neuropsychological evaluations conducted in 2005-2006 by Dr.

4

Joseph Moldover, a privately retained physician, A.R. 1143-48, which were relied on by Sudbury's school psychologist in her assessment of Student. *See* A.R. 1111-13.

On March 5, 2007, an IEP Team meeting was convened, and the Team determined that Student was eligible for special education services and discussed components of a possible IEP. Team Meeting Summary, A.R. 1106-10. At the meeting, Sudbury officials indicated that they would recommend an IEP placing Student in a language-based program within the school district, but Parent indicated that she would not remove Student from The Carroll School. *Id.* 1108. On March 15, 2007, Sudbury proposed an IEP placing Student in a Sudbury elementary school where he would participate in a general education classroom for social studies and science and specialized instruction for reading, writing and math. Individualized Education Program, Mar. 19, 2007 - Mar. 18, 2008, A.R. 1091-1105. The IEP was effective through March of 2008. *Id.* Parent never responded to the proposed IEP. Testimony of Parent, A.R. 2070.

Parent enrolled Student for the fourth grade (2007-2008 school year) at The Carroll School at her own expense. When the IEP proposed in 2007 expired on March 18, 2008, Sudbury did not propose a new one for 2008-2009. *See* Parent Testimony, A.R. 2099-2100. In September of 2008, when Student was starting his fifth grade year at The Carroll School, Parent requested that Sudbury test Student in math. Note from Parent, Sept. 29, 2008,

A.R. 1090. Sudbury proposed educational assessments to Parent, Letter from Sudbury Public Schools, Sept. 29, 2008, A.R. 1087-89, but Parent instead accepted assessments proposed by The Carroll School. Testimony of Luan Dean, A.R. 2312-13.

In late 2008 and early 2009, Dr. Ann Helmus was privately retained by Parent to conduct neuropsychological evaluations of Student. Report of Neuropsychological Evaluation, A.R. 1057-67. At Parent's request, Sudbury representatives met with her on May 4, 2009 to discuss Dr. Helmus' evaluation, and they proposed additional testing to determine eligibility for special education and to aid in the development of an IEP. Letter from Sudbury Public Schools, May 4, 2009, A.R. 1052-54; Meeting Notes, May 4, 2009, A.R. 1055-56. In June of 2009, Sudbury conducted a number of evaluations of Student, including a psychological assessment, A.R. 1031-33, a classroom observation at The Carroll School, A.R. 1034-38, an occupational therapy consultation, A.R. 1050-51, a speech/language evaluation, A.R. 1049-1049D, and an academic achievement assessment, A.R. 1042-48. In addition, at Parent's request, Dr. Helmus observed the Language Learning Disabilities ("LLD") program offered by the Ephraim Curtis Middle School ("Curtis Middle School"), a Sudbury public school, Report of School Program Evaluation, A.R. 1039-41, although her report was not made available to Sudbury until after the 2009-2010 IEP had been proposed and revised.

An IEP Team meeting was held on June 18, 2009, and an IEP was proposed by Sudbury for Student's 6th grade year (2009-2010) which provided for certain special education services, including placement in the Curtis Middle School's LLD program. Individualized Education Program, July 1, 2009 - June 17, 2010, A.R. 999-1017. Under the proposed IEP, Student would participate in small group "pull-out" classes for English language arts (ELA) and math, and would join a larger general education classroom for social studies and science. *Id.* at 1000. On June 20, 2009, Parent obtained a second audiological/auditory processing evaluation from Ms. Shubow. Report of Audiological/Audtitory Processing Evaluation, A.R. 1023-30. On July 10, 2009, Parent rejected the IEP and requested a meeting to discuss the refused placement. Response Section, Individualized Education Program, A.R. 1016-18. In her comments, Parent cited her belief that continued placement in The Carroll School was most appropriate based on Dr. Helmus' and Ms. Shubow's evaluations, particularly their recommendation that Student should be placed in small classrooms with children who have similar disabilities. Response Section, Individualized Education Program, A.R. 1016-18.

On September 8, 2009, Sudbury requested to reconvene the IEP Team for the purpose of reviewing the new audiological evaluation which had not been available at the June 18, 2009 meeting. E-Mail from Kelly Diette, Team Chairperson and School Psychologist, A.R. 1590-91. The IEP Team met on September 10 and discussed the

report and proposed revisions. Team Meeting Summary, Sept. 10, 2009, A.R. 1594-98. A revised IEP was proposed on September 30 and was rejected by Parent. Individualized Education Program, Sept. 24, 2009 - June 17, 2010, A.R. 1601-22. The revised IEP included certain additional special education services, including accommodations for Student's auditory processing disorder, but maintained his placement in larger general education classrooms for social studies and science. *See id.* at 1602.

## C. *Proceedings before the BSEA*

Parent requested a hearing from the BSEA on July 23, 2009, after she rejected the first IEP. Hearing Request Form, A.R. 1-4. A hearing was initially set for August 28, 2009, but after one postponement requested by Sudbury and another by Parent, it was ultimately held on February 10 and 12 and March 9, 2010. Notice of Hearing, July 27, 2009, A.R. 5; Order, Aug. 19, 2009, A.R. 52; Order, Oct. 27, 2009, A.R. 87; Bureau of Special Education Appeals, Decision No. 10-0704 at 1-2 (Apr. 9, 2010) [hereinafter BSEA Decision]. Parent appeared *pro se,* and after evidence was presented on both sides and closing arguments were submitted, the Hearing Officer issued a decision on April 9, 2010.

The findings of the Hearing Officer remaining in dispute are the following: (1) the IEP proposed by Sudbury for the sixth grade year (2009-2010) did not offer FAPE; (2) Parent's unilateral placement at The Carroll School was appropriate; and

8

(3) Parent is entitled to reimbursement for her out-of-pocket expenses for that year. *See generally* BSEA Decision.[1]  The Hearing Officer's holding that the IEP did not offer FAPE was based in large part on Sudbury's placement of Student in mainstream science and social studies classes. *Id.* at 21-28.  He concluded that "the LLD program is not sufficiently tailored to Student's unique educational profile to allow him to access (and make meaningful or effective progress in) the science and social studies curricula." *Id.* at 27.

In his decision, the Hearing Officer specifically declined to award prospective placement at The Carroll School or ongoing reimbursement of Parent's expenses with respect to such placement. *Id.* at 2 n.1.  He explained that, because Parent did not raise the issue of prospective placement until the opening of the evidentiary hearing, "[i]t would be unfair to assume that Sudbury should have understood that the Parent was seeking prospective placement since a reimbursement claim is legally and factually different than a claim that the School District should issue an IEP that prospectively places Student." *Id.*  As a result, the decision did "not address any rights that Parents may

---

[1] The Hearing Officer also found that Sudbury denied Student FAPE for the fifth grade year (2008-2009) but that Parent was not entitled to reimbursement for placement at The Carroll School because she failed to give Sudbury adequate notice that she would be seeking such reimbursement.  Parent does not appeal that decision, and there remains no dispute because no relief is sought.

have regarding Student's prospective placement at The Carroll School." *Id.* at 3 n.1.

### III. STANDARD OF REVIEW

The IDEA provides that, when reviewing a hearing officer's decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). When a party challenges the outcome of the administrative proceedings under the IDEA, the "burden rests with the complaining party to prove that the agency's decision was wrong." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir. 1990). As a result, Sudbury bears the burden of demonstrating that the Hearing Officer's decision should be overturned.

The IDEA's mandate that a reviewing court considering a state administrative record "base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982). A court must give the administrative proceedings "'due weight,'" and "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland Sch. Comm.*,

998 F.2d 1083, 1087 (1st Cir. 1993) (quoting *Rowley*, 458 U.S. at 206). Thus, in considering motions for summary judgment where, as in this case, no evidence has been submitted to supplement the record, the court must apply "an intermediate standard of review . . . which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review." *Id.* at 1086; *see also Lessard*, 578 F.3d at 24 ("[J]udicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.").

### III. ANALYSIS

*A.* ***Denial of FAPE and the Reimbursement Order for Sixth Grade***

Sudbury challenges the Hearing Officer's determination that the proposed IEP for sixth grade (2009-2010) failed to offer FAPE and also the grant of the equitable remedy of retroactive reimbursement to Parent for Student's 2009-2010 placement at The Carroll School. For the reasons described herein, I will affirm the Hearing Officer's decision.

### 1. Adequacy of the 2009-2010 IEP

Sudbury takes the position that the revised 2009-2010 IEP placing Student in the LLD program at Curtis Middle School was reasonably calculated to provide FAPE in the least restrictive

setting,[2] based on the information available to the IEP Team at the time the original and revised IEPs were proposed. Sudbury argues that the record does not support the Hearing Officer's finding of failure to provide FAPE and that the Hearing Officer improperly credited Parent's witnesses and exhibited partiality toward Parent over the course of the hearing.

*a. Substantive Standard for Provision of FAPE*

The Supreme Court has explained that a state "satisfies" the requirement to provide FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. In enacting the IDEA (formerly the Education of the Handicapped Act), "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make . . . access [to public education] meaningful." *Id.* at 192; *see also LT. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361

---

[2] The IDEA requires placement in the "least restrictive environment," meaning that

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5). Although Sudbury makes reference to the "least restrictive environment" requirement, it does not argue that the requirement was not met here.

12

F.3d 80, 83 (1st Cir. 2004) (applying the *Rowley* standard to the
IDEA as amended).  Thus, the IDEA's requirements with respect to
the development of IEPs "does not imply that a disabled child is
entitled to the maximum educational benefit possible." *Lessard*,
518 F.3d at 23.  Rather, "[a]n IEP need only supply 'some
educational benefit,' not an optimal or an ideal level of
educational benefit, in order to survive judicial scrutiny." *Id.*
at 23-24 (quoting *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs.
R.*, 321 F.3d 9, 11 (1st Cir. 2003)); *see also Rowley*, 458 U.S. at
196-200; *Lenn*, 998 F.2d at 1086.

The Hearing Officer thoroughly and accurately summarized the
standard to be applied in determining whether FAPE had been
offered in the IEP, and it is against this standard that I review
the decision.  *See, e.g.*, BSEA Decision at 13 ("FAPE does not
require Sudbury to provide special education and related services
that will maximize Student's educational potential.") (footnote
omitted); *id.* at 14 ("An IEP must be developed which is
'reasonably calculated to enable the child to receive educational
benefits.'") (quoting *Rowley*, 458 U.S. at 207).

   b.   *Evidence Relied on by Hearing Officer*

Sudbury claims that the Hearing Officer's finding that the
IEP was inadequate is not supported by the record.  In
particular, Sudbury argues Parent offered insufficient evidence
to bear her burden of showing that the IEP failed to offer FAPE
and that the Hearing Officer abused his discretion in incorrectly

crediting the Parent's experts. Sudbury points to Student's poor progress in academic evaluations during the time he was enrolled at Carroll and other information available to Sudbury at the time the revised IEP was proposed to demonstrate that the IEP was reasonably calculated to offer FAPE.

The Hearing Officer discussed in detail his assessment of testimony and other evidence and his reasons for concluding that the proposed IEP did not offer FAPE. BSEA Decision at 21-28. In general, he found that the Sudbury witnesses offered "credible testimony that the LLD program, as a whole, would be appropriate for Student." *Id*. at 21. In particular, he found Sudbury's "evidence to be persuasive with respect to the appropriateness of the math and English language arts components of the curriculum, as well as the specialized instruction that Student would receive for purposes of remediating his language-based learning deficits." *Id*.

> However, against this evidence, the Hearing Officer found
>
> Parent's evidence to be more persuasive that with respect to science and social studies in particular, Student would not be likely to access Sudbury's curriculum in a meaningful manner and would be unlikely to progress effectively in the science and social studies content areas of the general curriculum as taught in Sudbury's proposed program and as reflected in its proposed IEPs.

*Id*. The Hearing Officer relied on the reports and testimony of Parent's three expert witnesses as well as The Carroll School witnesses to reach this conclusion. *Id*. at 21-22.

Credibility determinations are the province of the

14

factfinder, in this case the Hearing Officer.  *See, e.g.*, *Wytrwal v. Saco Sch. Bd.*, 70 F.3d 165, 171 (1st Cir. 1995) (stating, in a case not involving the IDEA, that the "choice" to credit testimony "is within the discretion of the factfinder").  The Hearing Officer stated that he relied significantly on the testimony and reports of Dr. Helmus, crediting her "sophistication, candor, knowledge of Student, and experience working for parents and public school districts alike."  BSEA Decision at 23.  He also specifically noted the testimony of Ms. Shubow, the audiologist; Dr. Pliner, a neuropsychologist engaged by Parent after the revised 2009 IEP had been rejected; and The Carroll School staff.  *Id.* at 21-25.  All of this testimony supported the conclusion that "Student would likely have difficulty learning effectively within a classroom of approximately 20 students."  *Id.* at 25.  The Hearing Officer explained that he credited Parent's witnesses, in part, because "they have a more complete, more detailed, and more informed understanding of Student, his educational needs and how those needs can be appropriately met."  *Id.* at 27.

    The Hearing Officer found that the evaluations by Sudbury staff, in contrast to those of the Parent's experts, "were not as comprehensive or informing."  *Id.*  Although these witnesses also provided "credible" testimony that the LLD program was appropriate for many students with disabilities of a type similar to Student's, the Hearing Officer concluded that they

were not persuasive that they sufficiently understood the implications of Student's multiple deficits or that the LLD program could be sufficiently tailored to meet Student's unique educational needs — particularly, with respect to the regular education classes in science and social studies where Student would likely have extreme difficulty keeping up with the pace and content of the classroom instruction. I also was not persuaded that Sudbury staff fully appreciated the likely negative implications to Student's learning (for example, becoming disengaged) if he met with substantial difficulties understanding what was being taught.

*Id.*

The record does not support Sudbury's contention that Parent's experts were impermissibly credited by the Hearing Officer. The Decision reflects a fair, nuanced and necessary assessment of the various witnesses by the factfinder. Sudbury asserts a number of reasons that the testimony of Parent's experts should be *dis*credited, but many of these consist of conclusory allegations as to Parent's motive, which are of dubious basis and relevance. *See, e.g.*, Pl.'s Corrected Mem. Support Mot. Summ. J. at 18 ("Observations [of public school services], if done at all, were done after the reports were completed, and only because Parent was going to a hearing."); *id.* (alleging, with respect to a physician who apparently evaluated Student but did not offer testimony or a report, that "he was unwilling to write what the parent wanted"). The allegations to the contrary notwithstanding, the Hearing Officer's consideration of the evidence actually adduced, including his assessment of the credibility of witnesses as outlined in the Decision, is

supported by the record.

The Hearing Officer found certain information helpful to his evaluation of the revised IEP, even though that information was not available to the IEP Team in the summer or fall of 2009.[3] However, the Hearing Officer also determined that the materials possessed by the Team at the time of the second IEP Team meeting (in September of 2009) contained sufficient information to conclude that the resulting IEP failed to offer FAPE to Student. The Hearing Officer cited Dr. Moldover's 2005 and 2006 neuropsychological evaluations, A.R. 1143-48, 1187-1203, Dr. Helmus' 2008/2009 neuropsychological evaluation, A.R. 1057-67, and Ms. Shubow's second audiological evaluation, A.R. 1023-30, as providing "ample evidence of the overwhelming difficulty of Student's accessing successfully the science and social studies classes." BSEA Decision at 27. The Hearing Officer's conclusion that Student would be unable to effectively access the proposed social studies and science classes is supported by the cited

---

[3] The most substantial piece of new information introduced at the hearing but unavailable to the IEP Team was the report and testimony of Dr. Pliner. Dr. Pliner is a licensed psychologist and pediatric neuropsychologist who observed Student at The Carroll School and the LLD program in late 2009 and also conducted a written language evaluation. She did not alter the previous diagnoses but rather rendered an opinion based in large part on previously conducted evaluations and her classroom observations. Although her conclusions and opinions were not available to the IEP Team, substantially all of the facts that she used to form those conclusions and opinions were known by the Team. *See* Testimony of Dr. Anita Pliner, A.R. 1971-2029; Written Language Evaluation, Jan. 8, 2009, A.R. 914-17.

reports and evaluations which were available to the IEP Team.[4]

Sudbury challenges these conclusions by attempting to demonstrate that (1) small class sizes are not critical to Student's receipt of FAPE and (2) the IEP adequately compensated for the challenges presented by Student's integration in large classes. Sudbury argues that Student's poor performance on certain evaluations while at The Carroll School and the Sudbury staff's familiarity with the LLD program's suitability for other children with Student's profile demonstrate that the proposed IEP met the standard of FAPE. However, these arguments fail to

---

[4] For example, Dr. Helmus' 2008-2009 report states that

"[i]n order to access grade level curriculum effectively and to master compensatory strategies for his learning disability, [Student] continues to require placement in a setting where teachers understand language based learning disabilities, other students have similar learning styles, and [Student] receives guidance and support in the development of his verbal academic skills. . . . . If placed in a mainstream school, [Student] might become even more disengaged from school and his academic skills may slip further if he were in a setting unable to meet his academic needs and surrounded by students who where not experiencing the same learning challenges."

Report of Neuropsychological Evaluation, A.R. at 1065-66. Dr. Helmus concluded that "[a]t this time, he would not be able to access grade level curriculum and make effective progress in a regular education class because of his learning disability and weak academic skills." *Id.* at 1066. Similarly, Dr. Moldover's 2006 report concluded that Student "should be in a classroom with six to eight other children matched to his level of development and without primary behavioral or psychiatric disorders," A.R. 1147, and Ms. Shubow's 2009 report found that "[s]maller more structured classrooms would be most appropriate for [Student]," A.R. 1027.

demonstrate that the Hearing Officer's findings and conclusions are unsupported by the record.

Sudbury asserts that certain academic evaluations of Student demonstrated that "[Student] had not made any progress during his three (3) years at Carroll." The Hearing Officer addressed the evaluations cited by Sudbury in his discussion of the appropriateness of placement at The Carroll School and noted that, taken together, the academic evaluations administered to Student show decline, progress, and no change in various areas. BSEA Decision at 32-33 & n.62. He also noted a lack of expert testimony or other evidence interpreting the scores. *Id.* at 33. As a result, he concluded that the evaluations "did not have sufficient clarity or probative value to rebut the testimony." *Id.* Although these findings were made with respect to the appropriateness of placement at The Carroll School, it is apparent that the Hearing Officer similarly discredited the evaluations in considering the sufficiency of the IEP.

Sudbury argues that the IEP was tailored to accommodate Student's language-based disability, auditory processing difficulties, and emotional needs in the mainstream classes. Sudbury asserts that, given the measures adopted in these areas, the conclusion that the proposed IEP "was inadequate is simply not supported by the record." As noted above, however, the Hearing Officer credited the IEP Team's familiarity with the LLD program and experience with other similarly situated students,

but weighed those factors against evidence proffered by Parent with respect to Student's unique characteristics, specifically his need to be in a small class setting for all classes. I find that the Hearing Officer's conclusion that Student would "not likely be able to access Sudbury's curriculum in a meaningful manner and would be unlikely to progress effectively in the science and social studies content area of the general curriculum," BSEA Decision at 21, to be supported by the record.

   c.  *The Hearing Officer's Conduct as Impartial Finder
       of Fact*

Sudbury alleges that the Hearing Officer exhibited partiality toward Parent by suggesting that she request an additional year of retroactive reimbursement, by amending the hearing request, and by conducting extensive examinations of witnesses, in particular those called by Parent. The record does not support a finding that the Hearing Officer's treatment toward the *pro se* Parent was born out of partiality or tainted the hearing or its outcome. Rather, it reflects a commendable effort to assure that all contentions were fully developed and evaluated.

At the outset of the hearing, the Hearing Officer inquired of Parent regarding the relief she was seeking, apparently to clarify a somewhat ambiguous Hearing Request asking for "Financial payments to The Carroll School on behalf of [Student]." Hearing Request Form, July 23, 2009, A.R. 003; *see*

Hearing Transcript, Feb. 10, 2009, A.R. 1630-31 (referencing this request in the Hearing Officer's questioning of Parent as to the relief sought). Parent explained that she wished to seek reimbursement for the 2009-2010 school year, as well as prospective placement at The Carroll School. Hearing Transcript, Feb. 10, 2009, A.R. 1629-31. Sudbury argued at the hearing that, because the Hearing Request was filed in July of 2009, Parent must have been seeking reimbursement only for time prior to July 2009 (i.e., the 2008-2009 school year).[5] *Id.* at 1631-32, 1635. Recognizing that Sudbury had apparently assumed that the 2008-2009 year was at issue, the Hearing Officer gave Parent the opportunity to request reimbursement for that year as well, which she did. *Id.* at 1634-35. As a result, the Hearing Officer decided that the hearing would address reimbursement for the 2008-2009 and 2009-2010 school years, but denied Parent's request to address prospective placement. *Id.* at 1637-37A. The Hearing Officer's questioning and decision did not display undue partiality to a *pro se* party who had submitted an ambiguous

_____

[5] There is ample evidence that Sudbury was aware that Parent's reimbursement request was for 2009-2010, not least because she promptly requested a hearing after rejecting the original proposed IEP for 2009. *See also* Response Section, Individualized Education Program, July 1, 2009 - June 17, 2010, A.R. 1018 (in which Parent states that the family is "looking for full reimbursement for [Student's] incoming sixth grade placement at The Carroll School"); Letter from Deborah N. Dixson, Special Educ. Adm'r, Sudbury Public Schools, Dec. 11, 2009, A.R. 1600 ("I am in receipt of the rejected [revised] IEP for [Student]. . . . As you know, this matter is already scheduled for a hearing with the BSEA."); BSEA Decision at 2 n.1.

Hearing Request, but rather a practical effort to clarify the record. *See*, *e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed *pro se* is 'to be liberally construed.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997) (affording pro se litigants "liberal interpretation" of complaints). In fact, the Hearing Officer ultimately denied reimbursement for 2008-2009, as well as Parent's request for prospective placement.

With respect to the examination of witnesses, the record does not support a finding that the Hearing Officer's questioning was born out of partiality as opposed to a desire to gather the information necessary to make his determination. For example, the portions of the testimony cited by Sudbury as inappropriate reflect the Hearing Officer's questioning of (1) Dr. Pliner regarding the bases for her opinions and the reasoning behind them, Testimony of Dr. Anita Pliner, A.R. 1976-86, and (2) Dr. Helmus regarding her reasoning, the materials she had reviewed, and her professional credentials. Testimony of Dr. Ann Helmus, A.R. 2035-38, 2051-54. The Hearing Officer conducted similar, although less extensive, questioning of Sudbury's witnesses. *See, e.g.*, Testimony of Renee Kramer, Speech-Language Pathologist, Sudbury Public Schools, A.R. 2140-41 (requesting clarification as to the services proposed in an IEP); Testimony of Kelly Diette, Team Chairperson and School Psychologist,

Sudbury Public Schools, A.R. 2229-31 (same).  Under

Massachusetts' Hearing Rules for Special Education Appeals, a

hearing officer has the duty to, among other things, "ensure that

the rights of all parties are protected; to define issues; to

receive and consider all relevant and reliable evidence; [and] to

ensure an orderly presentation of the evidence and issues," Rule

X.B. (February 2008), in furtherance of which, the officer is

authorized to "[e]xamine witnesses and ensure that all relevant

evidence is secured and introduced."  Rule X.B.8.  I find that

the Hearing Officer's questioning of witnesses was in furtherance

of his duties as a hearing officer and does not demonstrate

partiality toward Parent.

    2.  Retroactive Reimbursement as an Equitable Remedy

    When a school district fails to provide FAPE, a parent may

enroll the child in a private school and seek reimbursement as an

equitable relief.  *See Sch. Comm. of Town of Burlington, Mass. v.

Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) (ordering the

reimbursement of parents for the unilateral placement of student

in a private school).  In order to obtain reimbursement, the

parents must show that the "private placement desired" is "proper

under the Act and that an IEP calling for placement in a public

school was inappropriate."[6]  *Id.* at 370.  This equitable remedy

_____

    [6] In passing, Sudbury "submits that Student's lack of
progress at Carroll coupled with unlicensed staff . . . [means
that] Carroll, while an approved private school, is inappropriate
for Student."  As Sudbury notes, The Carroll School is approved

is available pursuant to the court's power, under the IDEA, to

"grant such relief as the court determines is appropriate."  20

U.S.C. § 1415(i)(2)(C)(iii); *see Burlington*, 471 U.S. at 369.

Sudbury contends that Parent's only purpose in interacting with

Sudbury and obtaining an IEP was to obtain payment for Student's

tuition at The Carroll School and that the equitable remedy

should be denied.

The record includes some support for Sudbury's contention

that Parent's primary motivation in her dealings with Sudbury was

to obtain funding for Student at The Carroll School.  As noted,

Parent moved to Sudbury with the intention of enrolling Student

at Carroll and did not contact Sudbury until after he was

enrolled there.  In addition, the out-of-district coordinator for

Sudbury Public Schools testified that, in meetings with Parent in

---

by the Commonwealth as an institution for language-based
disabilities, and Sudbury in fact funds the placement of other
children at Carroll, Testimony of Luan Dean, Out-of-District
Coordinator, Sudbury Public Schools, A.R. 2346, consequently the
relevance of the "unlicensed staff" reference is unclear.  With
respect to Student's test scores, as discussed *supra* section
III.A.1.b, the Hearing Officer found that the probity of
Student's academic test results was not sufficiently developed.
Sudbury does not rebut this determination in its memorandum.
Furthermore, because The Carroll School offers all subjects in
small class settings, it provides "some element of the special
education services missing from the public alternative." *Mr. I.
ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 24
(1st Cir. 2007) (quotation omitted) (stating further that "the
reasonableness of the private placement necessarily depends on
the nexus between the special education required and the special
education provided").  Sudbury fails to present sufficient
justification to disturb the Hearing Officer's reasoned opinion
with respect to the appropriateness of The Carroll School.  *See*
BSEA Decision at 28-33.

2006 and 2007, Parent "made it very clear" that she was not seeking public school services and Student would not be moving from The Carroll School, and that Parent did not observe the LLD program despite invitations to do so.  Testimony of Luan Dean, A.R. 2278-79, 2303-04; *see also* Team Meeting Summary, March 5, 2007, A.R. 1108 (quoting "Mom" as indicating "he's not moving"); Testimony of Kelly Diette, A.R. 2214 (stating, with respect to the Parent's 2009 request to discuss Dr. Helmus' report, "I believe that . . . [Parent] was looking for funding from Sudbury Public Schools to fund The Carroll School").

For her part, Parent testified that she would have accepted an IEP for public school placement if it had included all elements she thought were appropriate for Student.  Testimony of Parent, A.R. 2080-83.  She further testified that she did not visit the Sudbury schools (until shortly before the hearing commenced) because she believed that the proposed IEPs were inadequate on their face.  *Id.* at 2083-85.  Parent appears, nevertheless, to have participated meaningfully in the IEP Team meetings and other consultations.  *See* Team Meeting Summary, March 5, 2007, A.R. 1106-08; Meeting to Consider Evaluation, May 4, 2009, A.R. 1055-56.  She also consented to evaluations and provided documentation of evaluations that she obtained privately.  Despite the fact that Parent's rejection of the July 2009 IEP stated that she was seeking "full reimbursement for [Student's] incoming sixth grade placement at The Carroll

School," she cited as her reasons Student's past performance at The Carroll School, as well as the advice of Dr. Helmus and Ms. Shubow with respect to small class sizes, which constitutes a reasonable basis for rejecting the IEP.  Response Section, Individualized Education Program, July 1, 2009 - June 17, 2010, A.R. 1016, 1018.

The cases cited by Sudbury for the proposition that parents who are unwilling to consider placement in a public school are not entitled to reimbursement generally address circumstances, not present here, where the actions of the parents affirmatively impeded the development of an IEP.  For example, in *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279 (1st Cir. 2008), the First Circuit concluded that the parents' "unreasonable obstruction of an otherwise promising IEP process fully justifies a denial of reimbursement under the IDEA."  513 F.3d at 288.  In that case, the parents had "lost interest in the IEP process" which "supported an inference of parental obstruction" when they initiated a due process proceeding prior to the completion of a final IEP.  *Id*. at 287.  In the instant case, although Parent appears, going into the IEP process and throughout, to have held the view that The Carroll School was most suitable for Student, Sudbury cites no evidence of any obstruction or even loss of interest in the IEP process.  In fact, after rejecting the IEP proposed for 2009, Parent provided Sudbury with Ms. Shubow's new report and participated in a Team meeting to reconsider and

revise the IEP even though a final IEP had been proposed. Team Meeting Summary, Sept. 10, 2009, A.R. 1594-98.

Other cases cited by Sudbury include an instance where the parents were found to have "rendered impossible a fully collaborative experience" by "categorically opposing" public placement and "developing a competing IEP," *K.L.A v. Windham Southeast Supervisory Union*, 371 Fed. Appx. 151, 154 (2d Cir. 2010) (Summary Order), an instance where the "parents did not give [the district] the opportunity to make a formal offer of placement," *C.S. ex rel. Sundberg v. Governing Bd. of Riverside Sch. Dist.*, 321 Fed. Appx. 630, 631 (9th Cir. 2009) (Memorandum), and a case in which a hearing officer had found that "the parents "would not have agreed to any IEP that did not include a placement outside the public schools," *Mr. & Mrs. M. v. Ridgefield Bd. of Educ.*, No. 05-CV-584(RNC), 2008 WL 926518, at *1 (D. Conn. Mar. 31, 2008). Sudbury fails to demonstrate that Parent's conduct was anything like that of the parents in the cited cases. As a result, I decline to find that a balance of the equities weighs against awarding Parent retroactive reimbursement.

## B. Entitlement to Tuition and Transportation Costs Pending Appeal Under "Stay Put" Provision

The final issue presented is whether Parent is entitled to reimbursement from Sudbury for tuition and transportation costs incurred for Student's enrollment at The Carroll School following

the administrative decision.  The IDEA's "stay put" provision states that "during the pendency of any proceedings . . ., unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).  In *Burlington*, the Supreme Court found that an administrative decision in favor of a private school chosen by the parents "would seem to constitute agreement by the State to the change of placement," thereby making the private school the current placement.  471 U.S. at 372.  This holding is codified in federal regulations at 34 C.F.R. § 300.518(d) which states that "[i]f a hearing officer in a due process hearing . . . agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents."

In *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576 (5th Cir. 2009), the Fifth Circuit addressed similar circumstances.  The parents challenged the public school placement for 2004-2005, and unilaterally placed their child in a private school for that year, where she remained into the 2005-2006 school year.  Relying on *Burlington*, the Fifth Circuit found that the hearing officer's decision granting reimbursement for the private placement for 2004-2005 constituted an agreement between the state and the parents that the private placement was proper and that the parents could be awarded the costs of the private placement pending appeal even though they did not request

it until a year after the review by the district court had

commenced.  *Houston*,  582 F.3d at 600-01.

Sudbury attempts to rely on the First Circuit's decision in

*Burlington*, *Town of Burlington v. Dep't of Educ. for Commonwealth*

*of Mass.*, 736 F.2d 773 (1st Cir. 1984), to argue that

reimbursement for the pendant placement is only available for the

period of the challenged IEP.  *See* 736 F.2d at 801.  However,

that position was not adopted by the Supreme Court, which more

generally granted reimbursement for the private placement pending

judicial review without mentioning a time limit for that review.

*See Burlington*, 471 U.S. 372-373.  The Supreme Court's decision

in *Burlington* must be read as having refined the First Circuit's

holding with respect to the duration of the "stay put" payments.

Parent may be awarded reimbursement for the pendant placement

even though the time period of the initial IEP has passed and

even though a separate IEP has been proposed for the 2010-2011

school year.[7]  *See Mackey ex rel. Thomas M. v. Bd. of Educ. for*

*Arlington Cent. Sch. Dist.*, 386 F.3d 158 (2d Cir. 2004) (ordering

funding for pendent placement, even though an IEP had been

proposed for the second year, and was ultimately found to offer

FAPE).

Sudbury relies on *L.M. v. Capistrano Unified Sch. Dist.*, 556

---

[7]     Sudbury issued an IEP for the Student for the 2010-2011
school year that has been rejected by Parent but has not been the
subject of a due process hearing.

F.3d 900 (9th Cir. 2009), to argue that where no decision as to prospective placement has been made, "stay put" rights to placement cannot be asserted. In that case, "without ever adjudicat[ing] the appropriateness of [L.M.'s] private placement," the district court ordered reimbursement for parents who prevailed on a procedural challenge to the administrative process. 556 F.3d at 904 (internal quotation omitted). The Ninth Circuit overruled the award of funding for the pendant placement, contrasting the case with those where "the reviewing courts could imply 'current educational placements'" based on "findings on the merits." *Id.* at 903. Here, there has been a finding on the merits that The Carroll School is an appropriate placement for Student for 2009-2010, consequently the *Capistrano* reasoning is inapplicable.

The key question for purposes of applying the "stay put" provision here is whether there is an agreement between the state and Parent with respect to Student's current placement. I recognize that the Hearing Officer explicitly stated that his decision did "not address any rights that the parents may have regarding Student's prospective placement at The Carroll School," a holding that the Defendants did not appeal. BSEA Decision at 3 n.1. I do not, however, find that the Hearing Officer's statement precluded the funding of Student's placement at The Carroll School pending the appeal of his decision. Such a determination would have demanded an explanation of the equities

30

behind such a denial of relief.  Rather, I find that the Hearing

Officer's statement clarified that Sudbury was free to propose a

new IEP for 2010-2011 offering FAPE in a public school setting.

In that sense, his Decision had no independent implications for

IEPs offered in future years.  If prospective placement had been

granted at The Carroll School, Sudbury would had have to appeal

that placement in this Court in order to change the

determination.  Instead, Sudbury has proposed an IEP for 2010-

2011, which has been rejected by Parent and must be the subject

of a separate action.  I therefore find that, notwithstanding the

Hearing Officer's statements, his decision constituted an

agreement between the state and Parent regarding Student's

placement and pending further proceedings, The Carroll School is

and remains the Student's "current educational placement" for

purposes of the "stay put" provision.

## IV. CONCLUSION

For the reasons outlined above, I will affirm the Hearing Officer's Decision and declare The Carroll School to be Student's current educational placement.[8]  Accordingly, I

(a)  GRANT Parent's motion to enforce Student's right to stay put (Dkt. No. 24) and the motions for summary judgment of Parent and the BSEA (Dkt. Nos. 34 & 38) and

(b)  DENY Sudbury's motion for summary judgment (Dkt. No. 31).

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[8] I have no reason to believe that the Plaintiff will not promptly fulfill its reimbursement obligations on the basis of this declaration.  Consequently, I find no reason to make a more detailed equitable decree regarding reimbursement.